MARYALYCE VEGA, Plaintiff-Appellee, *v.* NATIONAL UNION FIRE INSURANCE COMPANY OF PITTSBURGH, PA., INC., a Pennsylvania corporation, AMERICAN INTERNATIONAL ADJUSTMENT COMPANY, INC., a Delaware corporation, and BEVERLY A. LOVE, Defendants-Appellants

NO. 9165

(CIVIL NO. 72005)

MAY 3, 1984

LUM, C.J., NAKAMURA, PADGETT, HAYASHI AND WAKATSUKI, JJ.

OPINION OF THE COURT BY NAKAMURA, J.

A rule promulgated by the Insurance Commissioner of the State of Hawaii pursuant to the Hawaii Motor Vehicle Accident Reparations Law (the No-Fault Insurance Law)[1] mandates that "[a]ny [no-fault insurance] policy issued or renewed on or after September 1, 1974 shall provide the coverage required of a no-fault policy in accordance with the endorsement prescribed by the Commissioner or such modification thereof approved in writing by the Commissioner prior to its issuance."[2] The Basic No-Fault Endorsement prescribed by the Commissioner for all motor vehicle insurance policies contains a specific clause that compels an injured person eligible for no-fault benefits to "submit to medical examination by physicians selected by, or acceptable to, the . . . [insurer] when, and as often as, the . . . [insurer] may reasonably require." The Circuit Court of the First Circuit found the provision to be "inconsistent with the no-fault law and therefore invalid." We too conclude the provision is void, but for a different reason — it has not been adopted as a rule in accord with dictates of the Administrative Procedure Act.

---

[1] Hawaii Revised Statutes (HRS) § 294-37 provides in relevant part as follows:

In order to carry out the provisions and fulfill the purpose of this chapter the commissioner shall:

. . . . 

(2) Make, promulgate, amend, and repeal such regulations, pursuant to chapter 91, as he deems necessary . . . .

[2] See § 16-23-60 of the Rules and Regulations of the Department of Commerce and Consumer Affairs of the State of Hawaii.

I.

Maryalyce Vega was injured in an automobile accident on October 4, 1980, and thus became eligible for benefits, including payments designed to cover her medical and rehabilitation expenses and loss of income, under a no-fault policy of motor vehicle insurance written by the National Union Fire Insurance Company (National Union or the insurer). National Union paid benefits to Mrs. Vega for nearly a year as the expenses and wage loss accrued, the payments being made on the strength of periodic reports submitted by her attending physician.

But in time the protracted duration of her physical disability was questioned by American International Adjustment Company (American International), the claims adjusting firm engaged by the insurer, and a series of pointed inquiries about her medical situation ensued. In a report submitted in August of 1981, the physician acknowledged that his patient's recovery was not progressing at a satisfactory pace. The narrative further denoted he would be prescribing a more active regimen of physical therapy for her, which he anticipated would continue for another six to nine months.

American International's doubts about Mrs. Vega's physical condition and medical care were not dispelled by the diagnosis and prognosis offered by her doctor, and she was subsequently "ordered" by a representative of the company to appear for a medical examination it had scheduled for January 7, 1982 with a physician of its choosing.[3] However, Mrs. Vega elected not to comply with this directive upon the advice of her attorney. Counsel's position on the matter, as set forth in a letter to the adjuster, was that the

---

[3] The claims adjuster's communication to Mrs. Vega indicated it was invoking Part F, Condition F of the insurance policy issued by National Union in seeking the examination. The particular provision of the policy invoked by the adjuster reads:

The eligible injured person shall submit to medical examination by a physician selected by, or acceptable to, the Company when, and as often as, the Company may reasonably require.

Since the No-Fault Endorsement prescribed by the Insurance Commissioner contains the foregoing provision, it is incorporated in every no-fault insurance policy issued in Hawaii as a condition for the receipt of statutorily mandated benefits.

In view of our ruling, *infra*, that the provision was not validly adopted as a "rule" pursuant to the Administrative Procedure Act, we do not decide here whether the imposition of such a condition is inconsistent with the purpose and policy of the

benefit claimant's physical condition had been substantiated by her doctor and "the No-Fault Statute . . . [did] not require the injured person to be subjected to any insurance examination, and any such requirement found in the policy is obviously in contravention of the statute and is therefore invalid and unenforceable."

The dispute was brought to a head in May of 1982 by American International's letter informing Mrs. Vega that her no-fault benefits were being "retroactively terminated" as of January 7, 1982 as a consequence of her refusal to appear for the scheduled "IME."[4] The response to this self-help measure was a suit instituted by Mrs. Vega in the Circuit Court of the First Circuit, claiming the insurer, the claims adjusting firm, and the firm's representative breached obligations under the pertinent no-fault policy and seeking damages for such breach.

The defendants' responsive pleading denied any contractual violation or other wrongful conduct. In the summary judgment motion that followed they maintained "Part F, Condition F, was valid and enforceable because it had been approved by Hawaii's Insurance Commissioner . . . *and* because similar provisions . . . had been upheld in many other jurisdictions." (Emphasis in original). The circuit court found the argument unpersuasive. It accepted instead the plaintiff's thesis "that the legislature by allowing . . .. [the compulsory] examination in other general insurance policies but excluding it from vehicle insurance intended that such examination should not be allowed under [no-fault] policies,"[5] and ruled

---

No-Fault Insurance Law. However, a summary termination of benefits prescribed by statute may, in our opinion, be incompatible with due process. *Cf.* Goldberg v. Kelly, 397 U.S. 254, 261-63 (1970) (welfare benefits are a matter of statutory entitlement for persons qualified to receive them and procedural due process is applicable to their termination).

[4] In the parlance of the insurance industry "IME" is an acronym for "independent medical examination." But the term actually is a misnomer, inasmuch as the so-called independent examination is usually one conducted by a doctor employed by the insurer.

[5] The circuit court was referring here to two specific provisions in that part of the Hawaii Insurance Law covering accident and sickness insurance, namely HRS § 431-474 which reads:

There shall be a required provision relative to physical examinations and au-

the "IME" provision was "inconsistent with the no fault law."

When the defendants moved for reconsideration of·the denial of their plea for summary adjudication or for the allowance of an interlocutory appeal to this court, the plaintiff countered with her motion for partial summary judgment on the legal issue raised earlier by the defendants. The circuit court denied the plea for reconsideration and awarded plaintiff partial summary judgment. The defendants, however, were granted leave to seek interim review of the invalidation of the provision.

## II.

The circuit court based its declaration of invalidity on what was perceived as a mandate in the Hawaii Insurance Law, HRS Chapter 431, that the "required provision [in accident and sickness insurance policies] relative to physical examinations" shall not "apply to or affect . . . any policy of vehicle or liability insurance." HRS §§ 431-474 and 431-461(1); see note 5 supra. Inasmuch as the policy clause at issue compels an insured person seeking no-fault benefits to submit to medical examinations as directed by the insurer, we would agree the foregoing sections of the Insurance Code appear on cursory examination to control the situation. Yet we deem it unwise to endorse the circuit court's holding, for the profound changes wrought in the system of reparations for harm resulting from vehicular accidents since the particular Code provisions were adopted in 1955[6] render their applicability in the situation at hand

---

topsy. It shall be as follows:

> "Physical Examinations and Autopsy: The insurer at its own expense shall have the right and opportunity to examine the person of the insured when and as often as it may reasonably require during the pendency of a claim hereunder and to make an autopsy in case of death where it is not forbidden by law."

and HRS § 431-461(1), which in relevant part provides:

Nothing in sections 431-461 to 431-498 shall apply to or affect:

> (1) Any policy of worker's compensation insurance or any policy of vehicle or liability insurance with or without supplementary coverage therein . . . .

[6] See S.L.H. 1955, c. 277, pt. of § 1.

more than doubtful.[7] In our opinion, however, the clause compelling benefit claimants to undergo medical examinations as often as the insurer may reasonably require is nevertheless void, but for a different reason.

## A.

"In many government endeavors it may be impossible in the nature of the subject matter to specify with particularity the course to be followed. This is most obvious when a new field of regulation is undertaken." Stewart, *The Reformation of American Administrative Law*, 88 Harv. L. Rev. 1667, 1695 (1975). Realizing that it was breaking new ground with the No-Fault Insurance Law, the legislature set down the objects to be attained[8] and "legislated on the subject as far as . . . [it thought] reasonably practicable." *Buttfield v. Stranahan*, 192 U.S. 470, 496 (1904). It further indicated "the insurance commissioner [should] establish and implement an organized plan which . . . [would] assure the ready availability to all consumers of necessary motor vehicle insurance coverages." Hse. Stand. Comm. Rep. No. 187, in 1973 House Journal, at 839. And it provided the means for him to carry out the task.

"In order to carry out the provisions and fulfill the purpose of . . . [the law] the commissioner . . . [was directed to]:

(1) Consult with representatives of the private insurance business, and such other persons, public and consumer

---

[7] Although HRS §§ 431-474 and 431-461(1) have not been amended since they were enacted in 1955, motor vehicle insurance has been altered in concept and form by the No-Fault Insurance Law. A "policy of vehicle insurance" now satisfying the requirements of the law bears slight resemblance to the policies that were being written before no-fault policies were brought into being by legislative action in 1973.

Moreover, none of the parties has directed our attention to anything in the relevant legislative history even suggesting that these sections of Chapter 431 should apply to a no-fault policy issued to satisfy the requirements of Chapter 294. Our own research has also uncovered nothing that would lead us to believe they are applicable to the situation at hand.

[8] A broad statement of the purpose of the law is found in HRS § 294-1, which reads:

The purpose of this chapter is to create a system of reparations for accidental harm and loss arising from motor vehicle accidents, to compensate these damages without regard to fault, and to limit tort liability for these accidents.

organizations, and agencies of the federal, state, or local governments as he deems necessary;

> (2) Make, promulgate, amend, and repeal such regulations, pursuant to chapter 91, as he deems necessary . . . ."

HRS § 294-37. In short, he was charged with the function of implementing a new system of motor vehicle accident reparations and vested with ample authority to develop the detailed regulations necessary for its enforcement.

Exercising this delegated power in accord with HRS Chapter 91 as directed, the Commissioner adopted Rules and Regulations Relating to the Hawaii Motor Vehicle Reparations Act. A relevant rule, § 16-23-60, commands that

> [a]ny policy issued or renewed on or after September 1, 1974 shall provide the coverage required of a no-fault policy in accordance with the endorsement prescribed by the Commissioner or such modification thereof approved in writing by the Commissioner prior to its issuance.

Hence, there is little doubt about his power to require all no-fault policies to provide a basic coverage which in his considered opinion would be consistent with the No-Fault Insurance Law and its purpose.

But when the Commissioner prescribed the Basic No-Fault Endorsement for all insurers issuing motor vehicle insurance policies, he did not follow the procedure set forth in the Administrative Procedure Act. In our view HRS Chapter 91 also governed the issuance of the endorsement itself, and the Commissioner's neglect rendered the prescript fatally defective, except for those portions reflecting what the legislature had already prescribed in HRS Chapter 294.[9]

B.

The defendants and the Insurance Commissioner[10] argue the mandatory inclusion of a provision for compulsory medical exami-

---

[9] There is, of course, no basis for requiring "rules that have already been promulgated by the legislature" to be readopted by an administrative agency. Town v. Land Use Commission, 55 Haw. 538, 548, 524 P.2d 84, 91 (1974).

[10] The Commissioner, though not a party, submitted a brief as amicus curiae.

nations in every no-fault policy is valid because statutory requisites were met when the Rules and Regulations Relating to the Hawaii Motor Vehicle Reparations Act were adopted. Since one of the rules sanctioned the issuance of the basic endorsement, they contend nothing more was necessary to lend validity to the endorsement or any of its provisions. We disagree, for the Administrative Procedure Act demands more of a public administrator when he acts in a quasi-legislative capacity.

Although § 16-23-60 of the promulgated rules enabled the Commissioner to prescribe endorsements, it by no means gave him *"carte blanche* . . . [to] sidestep the independent requirements" of HRS Chapter 91. *Aguiar v. Hawaii Housing Authority,* 55 Haw. 478, 493, 522 P.2d 1255, 1265 (1974). *See also Koolauloa Welfare Rights Group v. Chang,* 65 Haw. 341, 344, 652 P.2d 185, 187 (1982). A "rule" for purposes of the chapter includes "each agency statement of general or particular applicability and future effect that implements, interprets, or prescribes law or policy."[11] Reading the pertinent part of the Basic No-Fault Endorsement with the foregoing definition in mind, we can only conclude it is a "rule" as defined by HRS § 91-1(4) and it should have been adopted as such in accord with the procedure set forth in HRS § 91-3.

The Commissioner's prescription of the Basic No-Fault Endorsement caused a specific clause compelling a benefit claimant to submit to medical examinations as directed by the insurer to be included in every no-fault policy written in Hawaii. The provision in the endorsement that brought this about could only be a "statement of general or particular applicability and future effect that implements, interprets, or prescribes law or policy." HRS § 91-1(4). It undoubtedly "touch[es] the affairs of the entire 'public,' " and

---

[11] HRS § 91-1(4) defines the term as follows:

"Rule" means each agency statement of general or particular applicability and future effect that implements, interprets, or prescribes law or policy, or describes the organization, procedure, or practice requirements of any agency. The term does not include regulations concerning only the internal management of an agency and not affecting private rights of or procedures available to the public, nor does the term include declaratory rulings issued pursuant to section 91-8, nor intra-agency memoranda.

"delineate[s] the future rights of . . . [an] entire class of unnamed individuals." *Aguiar v. Hawaii Housing Authority,* 55 Haw. at 485- 86, 522 P.2d at 1261.

"[W]here [an administrative agency] seeks to promulgate a 'rule,' " it "must consider the views of interested persons," *id.* at 487-88, 522 P.2d at 1262; for the "powers . . . of government should not be used in a manner giving an appearance of being arbitrary." *In re Western Motor Tariff Bureau, Inc.,* 53 Haw. 14, 19, 486 P.2d 413, 416 (1971). And since the Commissioner neither afforded interested persons an opportunity to be heard nor considered their views with respect to a proposed rule as required by the Administrative Procedure Act, the purported promulgation of the "rule" relating to compulsory medical examinations was a nullity. *See* HRS § 91-3(a)(1) and (2).[12]

The award of partial summary judgment to the plaintiff is affirmed for the foregoing reasons, and the case is remanded to the circuit court for further proceedings not inconsistent with this opinion.

*Barry M. Kurren (Howard F. McPheeters* and *Brian Aburano* with him on the briefs; *Burke, Ashford, Sakai, McPheeters, Bordner & Gilardy,* of counsel, for Appellant National Union.

*Henry N. Kitamura (Raymond J. Tam* and *Roy K. S. Chang* with him on the brief; *Shim, Sigal, Tam & Naito,* of counsel) for appellee.

---

[12] HRS § 91-3 in relevant part reads:

Procedure for adoption, amendment or repeal of rules. (a) Prior to the adoption of any rule authorized by law, or the amendment or repeal thereof, the adopting agency shall:

(1) Give at least twenty days' notice for a public hearing. Such notice shall include a statement of the substance of the proposed rule, and of the date, time and place where interested persons may be heard thereon. The notice shall be mailed to all persons who have made a timely written request of the agency for advance notice of its rulemaking proceedings, and published at least once in a newspaper of general circulation in the State for state agencies and in the county for county agencies.

(2) Afford all interested persons opportunity to submit data, views, or arguments, orally or in writing. The agency shall fully consider all written and oral submissions respecting the proposed rule. The agency may make its decision at the public hearing or announce then the date as to when it intends to make its decision. Upon adoption, amendment, or repeal of a rule, the agency shall, if requested to do so by an interested person, issue a concise statement of the principal reasons for and against its determination.

On the brief for Amici Curiae: *Randall Y. Iwase,* Deputy Attorney General, for the State of Hawaii, and *Clyde Matsui* and *Randall Y. S. Chung,* for State Farm Mutual Automobile Insurance Co., joined by *Paul T. Yamamura (Libkuman, Ventura, Ayabe & Hughes,* of counsel) for Tokio Marine & Fire Insurance Co.

*Steven J. Trecker (McKenzie, Trecker & Fritz,* of counsel) on the brief for Amicus Curiae Hawaii Academy of Plaintiff's Attorneys.